638 So.2d 1132 (1994)
FEDERAL INSURANCE COMPANY, et al.,
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY, First National Insurance Company of America, the Hartford Insurance Company of the Southeast, the Aetna Casualty and Surety Company, United States Fidelity & Guaranty Insurance Company, Travelers Insurance Company, and State Farm Fire & Casualty Company.
No. 93 CA 1099.
Court of Appeal of Louisiana, First Circuit.
June 24, 1994.
*1133 Denise Pilie, New Orleans, for plaintiff-appellee Jimmy Swaggart Ministries.
F. Lee Butler, New Orleans, for plaintiff-appellee Federal Ins. Co.
Terry Deffes, New Orleans, for defendant-appellee St. Paul Fire & Marine.
Thomas Usdin, New Orleans, for defendant-appellant First Nat. Ins.
Vincent Fornias, Baton Rouge, for defendant-appellee Hartford Ins. Co.
Rene Pastorek, Gretna, for defendant-appellee Aetna Cas. & Sur. Co.
W. Marvin Hall, Metairie, for defendant-appellee State Farm Ins. Co.
Katherine Muslow, New Orleans, for defendant-appellee Travelers Ins. Co.
Michael Fitzpatrick, New Orleans, for defendant-appellee Fidelity & Guar. Ins.
Frederick Bradley, New Orleans, for defendant-appellee Liability Assur. Soc.
Before WATKINS, SHORTESS and FOGG, JJ.
SHORTESS, Judge.
This consolidated appeal arises from judgments rendered in favor of Jimmy Swaggart Ministries (JSM) and State Farm Fire & Casualty Company (State Farm) on motions for partial summary judgment, and a judgment denying a new trial on the motions.[1] The trial court found that First National Insurance Company of America (FNICA) had a duty to defend its insureds, JSM and William Treeby.[2]
Both JSM and State Farm alleged FNICA owed a defense from the time the original and amending petitions in the underlying litigation were filed.[3] The trial court found FNICA had a duty to defend because the pretrial order in the Gorman suit disclosed a possibility of liability under FNICA's policy, and, on this basis, granted partial summary judgments in favor of JSM and State Farm.[4] The trial court, in oral reasons, stated it did not believe the original or amending petitions triggered coverage.
FNICA contends a pretrial order cannot trigger the duty to defend. It further contends that no allegations in the original or amended petitions were covered by its policy, and therefore no defense was owed to JSM or Treeby. Finally, FNICA argues that, as an excess insurer, no duty to defend could be imposed upon it as long as JSM had primary insurance.[5] State Farm and JSM answered the appeal, contending that the original and amending petitions triggered the duty to defend, or, alternatively, that the trial court was correct in finding a pretrial order can trigger the duty to defend.

A. Triggering the Duty to Defend
The duty to defend is broader than an insurer's liability for damage claims. This duty is determined by the allegations of the plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage. American Home Assurance Co. v. Czarniecki, 255 La. 251, 230 So.2d 253, 259 (1969); LaFever v. Whitely, 613 So.2d 1007 (La.App. 1st Cir.), writ denied, 614 So.2d 64 (La.1992). If, assuming all the allegations of the petition to be true, there would be both (1) coverage under the policy and (2) liability to the plaintiff, the insurer must defend the insured *1134 regardless of the outcome of the suit. Allegations in the petition are liberally interpreted in determining whether they set forth grounds which bring the claims within the scope of the insurer's duty to defend the suit brought against its insured. Id.
Even though a plaintiff's petition may allege numerous claims for which coverage is excluded under an insurer's policy, a duty to defend may nonetheless exist if there is at least a single allegation in the petition under which coverage is not unambiguously excluded. Duhon v. Nitrogen Pumping & Coiled Tubing Specialists, 611 So.2d 158 (La.App. 3d Cir.1992).
The FNICA policy[6] schedule lists stations WLUX-AM, KJOJ-FM, KJIL-FM, WHYM-AM, WAME-AM, WJYM-AM, and "Radio, Television and Cable programs distributed to others." In its "COVERAGE AGREEMENTS," FNICA agrees, in pertinent part:
To pay on behalf of the Insured all loss and claim expense which the Insured shall become legally obligated to pay because of liability imposed by law or assumed under contract as a result of one or more claims arising out of:
A. any form of defamation or other tort related to disparagement or harm to the character, reputation or feelings of any natural person or organization, including but not limited to, libel, slander, product disparagement, trade libel, infliction of emotional distress, outrage or outrageous conduct;
B. any form of invasion, infringement or interference with rights of privacy or publicity, including but not limited to false light, public disclosure of private facts, intrusion and commercial appropriation of name or likeness;
....
committed in the utterance or dissemination of matter arising out of an occurrence during the policy term regardless of when claim is made or suit is brought.
The "DEFINITIONS" section contains the meaning of "Matter" and "Occurrence."
"Matter" means the audio, audio-visual, musical, dramatic or artistic content of anything broadcast or telecast over scheduled stations or cable television systems, the printed or pictorial content of incidental publications and the content of any advertising material, promotional material, or publicity material, and use of such matter by others.
"Occurrence" means:
1. a broadcast, telecast or cablecast by or with the permission of the Insured over scheduled radio or television stations or cable television systems;
....
4. the gathering or obtaining of matter for broadcast, telecast or cablecast.
5. a broadcast, telecast or cablecast of scheduled program matter furnished by the Insured over non-owned, non-scheduled radio or television stations, cable television systems or satellite dishes.[7]
The event giving rise to the duty of the insurer to defend its insured is the Gorman defamation suit instituted in 1988. Gorman's petition states:
21.
During the days and months following July 15, 1986, the defendants, Jimmy Swaggart Ministries, Inc., William D. Treeby, The First Assembly of God of New Orleans, Louisiana, Inc., through the acts of its staff and board members, Michael Indest, Don Brankel and others better known to them, did make false statements and innuendos maliciously and with total disregard for the truth or falsity of said statements to citizens throughout the city. These defendants have repeated their false statements to reporters for various *1135 television stations in an attempt to get these statements published, all within their plan and scheme to destroy Marvin Gorman and Marvin Gorman Ministries, Inc. Particularly, these defendants told persons of the media and others that Marvin Gorman had "misappropriated and embezzled funds from the First Assembly of God of New Orleans, Louisiana, and that Marvin Gorman was connected with the Mafia."
Gorman's amended petition filed July 11, 1988, asserts a direct action against FNICA and other insurers. Gorman specifically alleges entitlement to recover from FNICA under the policy at issue here.
Although the allegations in Gorman's petition are broadly stated, the petition alleges sufficient facts which may constitute a claim for defamation. JSM and Treeby allegedly spread false information "to citizens throughout the city" and "repeated their false statements to reporters for various television stations in an attempt to get these statements published." When, where, and how the statements were made were detailed in depositions, interrogatories, other discovery, the pretrial statement of disputed facts, and the pretrial order.[8]
The absence of detailed times, dates, and places in the petition does not defeat our conclusion that the allegations state, at least rudimentarily, a claim which may be covered by the insurance contract. Rio Rouge Dev. Corp. v. Security First Nat'l Bank, 610 So.2d 172, 176 (La.App. 3d Cir.1992).
The allegations set forth grounds which bring the claim within the scope of an insurer's duty to defend. In reaching this conclusion, we re-emphasize that the insurer is relieved of its duty to defend only when the allegations of the petition unambiguously exclude coverage. In this case, the allegations are ambiguous, as evidenced by the need to clarify them later in the pretrial order. The fact that the allegations of the petition could be clarified to unambiguously include coverage also shows the original petition did not unambiguously exclude coverage.
Because we find the allegations in the original and amending petitions did not unambiguously exclude coverage, which would trigger a duty to defend, we need not address the issue of whether a pleading other than the petition can trigger the duty to defend.

B. Excess Coverage and the Duty to Defend
FNICA contends its "Other Insurance" clause makes its policy excess insurance. Because it claims to be an excess insurer, FNICA contends it has no duty to defend until the primary insurer's limits are met.
This court recently stated that the inclusion of an "excess clause" within the "other insurance" provision of an insurance policy does not transform a primary policy into an excess policy. Penton v. Hotho, 601 So.2d 762, 764, 765 (La.App. 1st Cir.1992). We stated at footnote 3:
In resolving conflicting "other insurance" clauses it is important to distinguish between policies that are true excess policies and those that are actually primary policies with "excess" other insurance clauses. A true excess policy is one that provides that the insurer is liable only for the excess above and beyond that which may be collected from the primary insurer. It is customary in such policies to include a requirement for underlying primary insurance for a certain amount and to list such other primary insurance within the excess policy. On the other hand an "excess" other insurance clause within a primary policy is considered a self-serving provision *1136 that attempts to make the insurer only secondarily liable if another unexhausted policy is available to cover claims. See 12A Couch on Insurance § 45:628 (M. Rhodes 2d ed. 1981).
FNICA's policy is a Media Special Perils/Broadcast Coverage Policy which insures JSM and its officers and directors for $2,000,000.00 per "occurrence" with a $10,000.00 deductible. The "DEDUCTIBLE" section of the policy states: "The limit of the Company's liability shall be in excess of the deductible amount stated in the Declarations...."
The limits of liability do not state a certain amount of underlying insurance is required, nor does the policy in any other clause list other primary insurance. Nowhere in the policy is there any requirement that FNICA obtain and/or maintain primary insurance. The policy contains only the following provision:
VII. OTHER INSURANCE
If the Insured has other valid and collectible insurance for a loss covered by this policy, the insurance afforded by this policy shall be excess over such other insurance unless such other insurance was specifically issued as excess over this policy.
This is precisely the kind of "other insurance" clause discussed in Hotho which does not transform a policy into an excess policy. The insurer remains a primary insurer with an "other insurance" clause, rather than a true excess insurer.
Because we find FNICA was a primary insurer, we find no merit to its contention that a duty to defend does not attach until the other insurer's limits are depleted.
Additionally, we note the underlying lawsuit made claims of $30 million in damages. Even if FNICA was a true excess insurer, any duty to defend would have been triggered by the original and amending petitions which did not unambiguously exclude coverage. All of the policies combined could not have satisfied the claims for damages made in the Gorman suit. Thus, no insurance company with a duty to defend, regardless of whether it was primary or excess, was relieved of its duty to defend in the Gorman suit, unless the allegations in the petition unambiguously excluded the policy's coverage.

C. The Question Still Exists: Did FNICA Have a Duty to Defend?
While we find the original and amending petitions were sufficient to trigger a duty to defend if it existed, the core question of whether the trial court correctly found a duty to defend remains unanswered.
The Louisiana Supreme Court in Meloy v. Conoco, Inc., 504 So.2d 833, 839 (La.1987), distinguished liability and indemnity policies, stating that:
An indemnity agreement is a specialized form of contract which is distinguishable from a liability insurance policy. A cause of action under a liability insurance policy accrues when the liability attaches. However, an insurer's duty to defend arises whenever the pleadings against the insured disclose a possibility of liability under the policy. On the other hand, an indemnity agreement does not render the indemnitor liable until the indemnitee actually makes payment or sustains loss. Therefore, a cause of action for indemnification for cost of defense does not arise until the lawsuit is concluded and defense costs are paid. The allegations of the complaint against the indemnitee are irrelevant to the indemnitor's obligation to pay. Rather, it is the terms of the indemnity agreement which govern the obligations of the parties.
(Citations and footnote omitted.) (Emphasis added.)
FNICA's policy is labeled a "Media Special Perils Policy" and does not further claim to be either liability or indemnity insurance. At the top of the first page, the policy states: "DEFENSE COSTS ARE INCLUDED IN THE LIMITS OF LIABILITY." The policy also includes defense costs in the definition *1137 of "loss,"[9] "damages,"[10] and "claim expense."[11] Additionally, the policy contains a "CONSENT ENDORSEMENT," which provides that "Defense Costs are included within the Limits of Liability or Limits of Insurance for this policy. Therefore the limits of liability may be reduced or completely depleted by defense costs."
Clause V, entitled "DEFENSE, COOPERATION OF INSURED, SETTLEMENT," contains the duties of the insured in the event of a claim.[12] The policy specifically requires that the insured employ counsel, file pleadings, and keep the company informed prior to trial. If the matter goes to trial, the policy specifically states the "[i]nsured shall proceed to conduct the defense thereof."
The policy further provides under clause XI, entitled "ACTION AGAINST THE COMPANY," that:
A. No action shall lie against the Company unless, as a condition precedent thereto ... the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement between the Insured, the claimant and the Company.
B. Any person or organization, or the legal representative thereof, who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.
Thus, the clear terms of the policy place the duty to defend on the insured. The obligations of the insured do not accrue until the loss suffered by the insured can be ultimately determined, which is at the time the underlying claims are adjudicated or settled. Therefore, we find that FNICA's policy was an indemnity policy which included defense costs within the limits of liability, but did not contain an implicit or explicit duty to defend.
The duty to indemnify and the duty to defend clearly are separate and distinct duties. The duty to indemnify is governed *1138 by the indemnity agreement and the allegations in the petition are irrelevant to the insured's obligations. Meloy, 504 So.2d at 839.

D. Conclusion
The trial court found that FNICA had a duty to defend based on allegations in the pretrial order and that FNICA's duty to defend attached at the time the pretrial order was filed. We find the allegations in the original and amending petitions would have been sufficient to trigger a duty to defend, if it had existed. Nevertheless, the trial court was clearly wrong as a matter of law in finding a duty to defend existed to be triggered. We find FNICA's policy was an indemnity policy which contained a duty to indemnify for losses sustained after the litigation was concluded, rather than a duty to defend.
Because the trial court incorrectly found a duty to defend which did not exist, we must reverse the judgments in favor of JSM and State Farm granting partial summary judgment and remand this case for further proceedings. Nevertheless, our ruling does not relieve FNICA of its obligation to contribute to defense costs. When the Gorman suit is concluded, FNICA's indemnity agreement should govern its obligations toward contributing to defense costs. Costs of this appeal are assessed to JSM and State Farm.
REVERSED AND REMANDED.
NOTES
[1] The parties and facts of this suit are recited in Federal Ins. Co. v. St. Paul Fire & Marine Ins. Co., 634 So.2d 40 (La.App. 1st Cir.).
[2] Treeby was JSM's attorney and a board member of JSM as well as a co-defendant in the underlying litigation.
[3] The title of the underlying suit is "David V. Adler, Trustee in Bankruptcy in the Matter of Marvin E. Gorman and Virginia A. Gorman v. Jimmy Swaggart," 87 CA 5289 ("the Gorman suit"). This lawsuit was filed in Civil District Court for Orleans Parish.
[4] State Farm was initially named a defendant by FNICA, who sought to recover costs incurred defending Treeby before State Farm took over the defense. State Farm answered the lawsuit and cross-claimed against FNICA and Treeby's other insurers seeking contribution of their share of the total amount State Farm spent defending Treeby in the Gorman suit.
[5] The parties do not dispute that St. Paul Fire and Marine Insurance provided primary insurance to JSM.
[6] The FNICA policy was not part of the appellate record because the exhibit envelope was not included in the record transmitted to this court. However, a copy of the policy was attached to State Farm's brief. None of the parties dispute that this is the policy at issue in this appeal. Therefore, we are able to review the provisions of the policy notwithstanding that the policy originally filed in the record as an attachment to the motion for summary judgment did not make its way to this court.
[7] This provision was added to the definition of "occurrence" by amendment.
[8] Gorman states in his deposition that he claimed false statements were made to "citizens throughout the city" by Swaggart on his daily television program and also on "hundreds" of videotapes for JSM programming. The pretrial order states contested issues of fact exist concerning printed information disseminated to television reporters by Treeby and also whether Swaggart made defamatory statements about Gorman in broadcasts on April 7, June 1, and June 3, 1987, on his program "A Study in the Word with Jimmy Swaggart." Videotapes disclosing statements made on broadcasts produced and aired by JSM were produced through discovery.
[9] "Loss" means "the to[t]al sum which the Insured becomes legally obligated to pay as damages in settlement of claims or in satisfaction of judgments."
[10] "Damages" means "all forms of monetary damages, including actual damages, statutory damages and punitive or exemplary damages, and legal expense or other costs included as part of a judgment or settlement...."
[11] "Claim Expense" means:

1. fees charged by an attorney in defense of a claim, including legal expenses necessitated by a demand for a retraction or correction; and
2. all other fees, costs and expenses which result from the investigation, discovery, adjustment, defense, settlement or appeal of a claim.
[12] Clause V states:

"DEFENSE, COOPERATION OF INSURED, SETTLEMENT
A. Insured's Duties in the Event of Claim; Conduct of Defense, Cooperation
1. In the event of a claim or suit the Named Insured shall give notice thereof to the Company as soon as practicable.
2. The Named Insured will employ counsel, approved by the Company, for defense of such claim or suit as follows:
a. The Named Insured shall file proper pleadings in said suit within the time required by law for filing same, keep the Company informed of all developments and expenses, and send to the Company any documents requested by the Company; and
b. If the suit is brought to trial, the Named Insured shall proceed to conduct the defense thereof. The Company, at its own election and expense, shall have the right to associate with the Named Insured in the defense.
3. The Insured shall in all respects cooperate with the Company and, at the Company's request, assist in making settlements and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured with respect to any claim to which insurance is afforded under this policy. The Insured shall attend hearings and trials, assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured and the Insured's counsel shall comply with any claim guidelines or procedures requested by the Company.
4. The rights of an insured under this policy shall not be prejudiced by the refusal of the Named Insured, or of anyone for whose acts the Named Insured is legally liable, to reveal the identity of a confidential source in connection with a claim or suit under the policy.
B. Settlements and Appeals
It is understood that the Named Insured may settle any claim for which the total cost of settlement and claim expense associated therewith is less than the amount of the remaining deductible. No offer to settle any other claim shall be made or accepted without prior written agreement by the Company.